Kerry A. Brennan
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036
(212) 858-1000

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TANYA STEELE,

                     Plaintiff,

     vs.

RICHARD BELL and JOSH MILANI GALLERY
PTY. LTD.,

                     Defendants.

11 Civ. 9343 (RA)

ECF CASE
ELECTRONICALLY FILED

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S SECOND MOTION FOR DEFAULT JUDGMENT**

PILLSBURY WINTHROP SHAW PITTMAN LLP
Kerry A. Brennan
1540 Broadway
New York, NY  10036-4039
Tel. (212) 858-1000
Fax (212) 858-1500

*Attorneys for Plaintiff*

501107993v8

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

ARGUMENT .........................................................................................................................3

I.      DECLARATORY JUDGMENT ....................................................................................4

      A.    Ms. Steele is the sole author of the Film......................................................4

      B.    Ms. Steele is the sole copyright owner of the Film......................................4

      C.    Ms. Steele's copyright registration for the Film is valid and enforceable. ...........5

      D.    Ms. Steele and Mr. Bell's contract to make the Film is enforceable,  and Mr. Bell breached the contract...........................................................6

      E.    Mr. Bell and the Milani Gallery infringed Ms. Steele's copyright in the Film. ..........................................................................................7

      F.    Mr. Bell's Copyright Registrations should be cancelled by the  Copyright Office. ...........................................................................9

      G.    Any agreements purporting to transfer any interest in the Film to Mr. Bell are null and void because Ms. Steele is the sole copyright owner in the Film. ....................................................................................11

      H.    Defendants are barred from bringing a claim against Ms. Steele for enforcement of the Australian judgment, or seeking to obtain ownership of the computer and hard drive containing the Film, because these claims have been dismissed with prejudice....................................................12

II.     PERMANENT INJUNCTION ....................................................................................13

III.    DAMAGES...............................................................................................16

      A.    Actual Damages ...................................................................................17

      B.    Statutory Damages ...............................................................................20

      C.    Attorneys' Fees and Costs .....................................................................27

CONCLUSION....................................................................................................30

501107993v8

# TABLE OF AUTHORITIES

## Cases

*Abeshouse v. Ultragraphics, Inc.*,
    754 F.2d 467 (2d Cir. 1985) ................................................................. 18

*Arista Records LLC v. Lime Group LLC*,
    No. 06 CV 5936, 2011 WL 1226277 (S.D.N.Y. Mar. 29, 2011) ............................ 22

*Bryant v. Media Right Prods., Inc.*,
    603 F.3d 135 (2d. Cir. 2010) ................................................................. 27

*Davis v. Blige*,
    505 F.3d 90 (2d. Cir. 2007) ............................................................... 8, 12

*Dyer v. V.P. Records Retail Outlet, Inc.*,
    No. 05 Civ. 6583 WL 2876494 (S.D.N.Y. Jul. 24, 2008) ............................... 5, 6, 8

*Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ...................................................................... 5, 8, 11

*Fitzgerald Publ'g, Co., Inc. v. Baylor Publ'g, Co., Inc.*,
    807 F.2d 1110 (2d. Cir 1986) ......................................................... 18, 27, 28

*Folio Impressions, Inc. v. Byer California*,
    937 F.2d 759 (2d. Cir. 1991) ................................................................. 6

*Harris v. Seward Park Hous. Corp.*,
    79 A.D.3d 425 (N.Y. Sup. Ct. 1996) ........................................................ 7

*Hounddog Prods., LLC v. Empire Film Group, Inc.*,
    826 F. Supp. 2d 619 (S.D.N.Y. 2011) ................................................. 14, 15, 16

*JCW Invs., Inc. v. Novelty, Inc.*,
    366 F. Supp. 2d 688 (N.D. Ill. 2005) ....................................................... 30

*Kwan v. Schlein*,
    246 F.R.D. 447 (S.D.N.Y. 2007) ........................................................... 25

*Mostly Memories, Inc. v. For Your Ease Only, Inc.*,
    594 F. Supp. 2d 931 (2009) ................................................................. 30

*N.A.S. Import, Corp. v. Chenson Enters., Inc*,
    968 F.2d 250 (2d Cir. 1992) ............................................................. 22, 27

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986). ................................................................. 13

*Pem-Am., Inc. v. Sunham Home Fashions, LLC*,
    No. 03-7707, 2003 WL 22964908 (2d. Cir. Dec. 12, 2003) .................................. 6

*Psychopathic Records, Inc. v. Anderson*,
    No. 08-cv-15034, 2010 WL 4683470 (E.D. Mich. 2010) ................................... 11

*Realsongs, Universal Music Corp. v. 3A N. Park Ave. Rest. Corp.*,
   749 F. Supp. 2d 81 (E.D.N.Y. 2010) ............................................................ 14, 15, 27

*Rogers v. Koons*,
   960 F.2d 301 (2d. Cir. 1991) ........................................................................ 18, 19

*Shady Records, Inc. v. Source Enter., Inc.*,
   No. 03 Civ. 9944, 2005 WL 14920 (S.D.N.Y. Jan. 3, 2005)................................. 17

*Troll Co. v. Uneeda Doll Co.*,
   483 F.3d 150 (2d. Cir. 2007) ........................................................................ 25

*Twin Peaks Prods., Inc. v. Publications Int'l., Ltd.*,
   996 F.2d 1366 (2d. Cir. 1993) ...................................................................... 28

*U2 Home Entm't, Inc. v. Lai Ying Music & Video Trading, Inc.*,
   No. 04 Civ. 1233, 2005 WL 1258917 (S.D.N.Y. May 25, 2005).......................... 28

*Van Cleef & Arpels, Inc. v. Schechter*,
   308 F. Supp. 674 (S.D.N.Y. 1969) .................................................................. 5

*WB Music Corp. v. RTV Comm. Group, Inc.*,
   445 F.3d 538 (2d Cir. 2006) ......................................................................... 27

*Whimsicality, Inc. v. Rubie's Costume Co., Inc.*,
   891 F.2d 452, 457 (2d Cir. 1989) .................................................................. 28

*Willsea v. Theis*,
   No. 98 Civ. 6773, 1999 WL 595629 (S.D.N.Y. 1999) ....................................... 11

## Statutes and Codes

United States Code
   Title 17, section 106............................................................................... 8, 12

United States Code
   Title 17, section 201(a) ............................................................................ 5

United States Code
   Title 17, section 410(c) ............................................................................ 6

United States Code
   Title 17, section 504(b) ............................................................... 4, 17, 18, 20

United States Code
   Title 17, section 504(c)(2) ........................................... 3, 17, 20, 21, 26, 27

United States Code
   Title 17, section 504(c)(4) ....................................................................... 4

United States Code
   Title 17, section 504(c) .................................................................... 21, 26

United States Code
  Title 17, section 505…………………………………………………………...…….17, 28, 30

## Rules and Regulations

Code of Federal Regulations
  Title 37, section 201.7(b)(1) ................................................................................. 10

## Other Authorities

M. Nimmer & D. Nimmer, Copyright section 2.01 (1990) ........................................... 5

M. Nimmer & D. Nimmer, Copyright section 60 (1968) ............................................ 5

iv

Plaintiff Tanya Steele ("Ms. Steele"), by her counsel, Pillsbury Winthrop Shaw Pittman LLP, respectfully submits this memorandum of law in support of her Second Motion for Default Judgment against Defendants Richard Bell and Josh Milani Gallery Pty. Ltd. (collectively, "Defendants").  This Court entered a Certificate of Default against Defendants on January 10, 2013.  Ms. Steele therefore respectfully asks that this Court grant an order of default containing the relief requested below.

## INTRODUCTION

This action relates to Defendants' intentional and wrongful creation of derivative works based on Ms. Steele's film *Blackfella's Guide to New York* (the "Film"), and the willful and unauthorized display of such derivative works.  Ms. Steele -- the creator, producer, and director of the Film -- has a registered copyright in all of the footage of the Film with the U.S. Copyright Office.  With full knowledge that Ms. Steele asserted copyright ownership in the Film, and without her permission, Defendants created, displayed, and promoted an Unauthorized Trailer and Unauthorized Photograph (defined herein) from the Film's footage in a university art gallery, on several Internet websites, and in print.  These works wrongly identified Mr. Bell as the creator of the Film, and no attribution to Ms. Steele was provided.  After temporarily removing these Infringing Works (defined herein) following receipt of a cease and desist letter, Defendants resumed display of the Infringing Works and refused to comply with repeated requests to cease display of those works.  As of the date of this motion, these unauthorized works continue to be publicly available on multiple Internet websites with Mr. Bell erroneously identified as the copyright owner and without any attribution to Ms. Steele's authorship and ownership of the copyright.

Ms. Steele now requests that the Court grant Ms. Steele the following relief:

- **Declaratory Judgment** – This Court should declare as follows:

  o **Ms. Steele is the author of the Film** because she single-handedly generated the concept for the Film and supervised the Film's creation from start to finish.

  o **Ms. Steele is the sole copyright owner of the Film** because she is the author of the Film and the only one with legal ownership of the work.

  o **Ms. Steele's copyright registration for the Film is valid and enforceable** because Ms. Steele possesses a certificate of copyright registration for the Film from the Copyright Office that is presumed valid, and Defendants have not rebutted this presumption.

  o **Ms. Steele and Mr. Bell's contract to make the Film is enforceable, and Mr. Bell is in breach of this contract** because Ms. Steele fully performed her obligations as producer and director of the Film and Mr. Bell failed to provide financing to complete the Film.

  o **Mr. Bell and the Milani Gallery infringed Ms. Steele's copyright in the Film** because they, intentionally and without authorization, created multiple infringing works from the Film and displayed these works on publicly-available websites, in print, and at a university art gallery.

  o **Mr. Bell's Copyright Registrations should be cancelled** because the material covered by his registrations is not original; it belongs solely to Ms. Steele, and Ms. Steele never transferred any of her ownership rights to Mr. Bell.

  o **Two agreements between Mr. Bell and James Richard and Soopum Sohn procured by Mr. Bell purporting to transfer certain interests in the Film to Mr. Bell should be declared null and void** because Ms. Steele is the sole copyright owner in the Film.

  o **Defendants are barred from bringing claims against Ms. Steele for enforcement of the Australian judgment or seeking to obtain ownership of the computer and hard drive containing the Film**, because these claims have been dismissed with prejudice.

- **Permanent Injunction** – Defendants should be barred from using any aspect of the Film in any way, including, but not limited to, the Unauthorized Trailer and Unauthorized Photograph, and ordered to remove all existing infringing works and to take reasonable efforts to regain copies of the infringing works that Defendants distributed to third parties (including, but not limited to, the American Federation of Arts, Tufts University Art Gallery, Australian media entities, and Vimeo.com).

- **Damages in the form of actual damages or statutory damages** – Ms. Steele should be awarded actual damages in the amount of $240,000, compromising $220,000 in

501107993v8

decreased market value of the Film and $20,000 in profits that Defendants have earned that are attributable to the infringing use of the Film.  In the alternative to actual damages, Ms. Steele seeks an award of $150,000, the maximum statutory damage award available under 17 U.S.C. § 504(c)(2), because Defendants willfully and maliciously infringed Ms. Steele's copyright in the Film on repeated occasions, creating multiple derivative works from the Film and displaying the infringing works in multiple formats and locations.  The infringing works continue to be displayed on the Milani Gallery's website and Facebook profile as of the date of this motion.

- **Attorneys' Fees and Costs** – Ms. Steele should be awarded attorneys' fees and costs in the amount of $445,305.87, because Defendants' copyright infringement was willful and Defendants unnecessarily prolonged the litigation by unilaterally abandoning settlement negotiations, defaulting on discovery deadlines, ignoring communications from Ms. Steele's counsel, and failing to appear for a Court conference.

## BACKGROUND

A detailed explanation of the factual background of this action can be found in the Declaration of Tanya Steele dated April 5, 2013 ("Steele Decl.").  The procedural background of this action is set forth in the Declaration of Kerry A. Brennan dated April 5, 2013 ("Brennan Decl.").

## ARGUMENT

This Court entered default judgment in Ms. Steele's favor on all claims.  Brennan Decl. ¶ 45 & Ex. G.  Ms. Steele's Amended Complaint asserted five counts against Defendants: (i) declaratory judgment, (ii) copyright infringement, (iii) fraud on the Copyright Office, (iv) breach of contract, and (v) deceptive practices in violation of New York General Business Law.  *Id.* Ex. C.

Accordingly, Ms. Steele respectfully requests that the Court grant the following relief: (1) declaratory judgment, as detailed below; (2) permanent injunction against Defendants using any aspect of the Film in any way, (3) actual damages pursuant to 17 U.S.C. § 504(b), or, in the alternative, statutory damages pursuant to 17 U.S.C. § 504(c)(2), and (4) attorneys' fees and costs.

I.      **Declaratory Judgment**

Ms. Steele respectfully requests that this Court issue a Declaratory Judgment providing as follows:

A.      **Ms. Steele is the sole author of the Film.**

This Court should order that Ms. Steele is the sole author of the Film because she single-handedly generated the concept for the Film and supervised the Film's creation from start to finish.  An author is the "creator" or "originator" of a work.  *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 352 (1991) (citing M. Nimmer & D. Nimmer, Copyright § 2.01 (1990)).  Ms. Steele independently conceived the Film's concept, an Aboriginal guided tour of New York City, and introduced the idea to Mr. Bell.  Steele Decl. ¶ 9.  Mr. Bell had suggested a wholly different concept for the Film, which was not pursued or developed.  *Id.* ¶ 6.  Throughout the process, Ms. Steele spent extensive time developing the concept, content, and overall aesthetic for the Film. *Id.* ¶¶ 8–9.  Indeed, the title for the Film emerged from Ms. Steele's idea: *Blackfella's Guide to New York City*.  *Id.* ¶ 10.

Therefore, Ms. Steele respectfully asks that this Court declare that Ms. Steele is the sole author of the Film.

B.      **Ms. Steele is the sole copyright owner of the Film.**

This Court should order that Ms. Steele is the sole copyright owner of the Film because she is the author of the Film and the only one with legal ownership of the work.

Legal ownership "vests initially in the author or authors of the work."  17 U.S.C. § 201(a); *Dyer v. V.P. Records Retail Outlet, Inc.*, No. 05 Civ. 6583, 2008 WL 2876494, at *3 (S.D.N.Y. Jul. 24, 2008); *see also Van Cleef & Arpels, Inc. v. Schechter*, 308 F. Supp. 674, 676 (S.D.N.Y. 1969) (citing M. Nimmer & D. Nimmer, Copyright § 60 (1968) ("[T]he person

4

claiming copyright must either himself be the author, or he must have succeeded to the rights of the author.")).

As the sole author of the Film, Ms. Steele is the only person who can claim a copyright in the Film.  Not once did Ms. Steele and Mr. Bell agree orally or in writing that Mr. Bell would own a copyright in the Film.  Steele Decl. ¶ 12.  Rather, Ms. Steele specifically told Mr. Bell and Mr. Milani, "And, to be clear, no film, stills or anything that has to do with the film can be shown without my permission."  *Id.* ¶ 40.  When Mr. Bell and Mr. Milani asked Ms. Steele to give Mr. Bell the copyright in the Film, she declined and wrote, "I do not, under any circumstance, give over copyright to any work I've created."  *Id.* ¶ 41.

Therefore, Ms. Steele respectfully requests that the Court declare that Ms. Steele is the sole copyright owner of the Film.

**C.     Ms. Steele's copyright registration for the Film is valid and enforceable.**

This Court should order that Ms. Steele's copyright registration for the Film is valid and enforceable because Ms. Steele possesses a certificate of copyright registration for the Film from the Copyright Office that is presumed valid, and Defendants have not rebutted this presumption.

When the Copyright Office determines that an application for copyright meets all requirements of the Copyright Act, and that the material constitutes copyrightable subject matter, it issues a certificate of copyright registration.  17 U.S.C. § 410(c).  "A certificate of copyright registration generates a presumption that the copyright is valid."  *Dyer*, 2008 WL 2876494, at *3 (quoting *Pem-Am., Inc. v. Sunham Home Fashions, LLC*, No. 03-7707, 2003 WL 22964908, at *1 (2d. Cir. Dec. 12, 2003)).  Such a presumption may be rebutted.  *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 763 (2d. Cir. 1991).

The Copyright Office issued a copyright registration certificate to Ms. Steele for the Film, Registration No. PAu003596424.  Steele Decl. ¶ 49 & Ex. B.  This registration continues

5

to be effective as of the date of this filing.  Defendants have not rebutted the presumption that this registration is valid.

Therefore, Ms. Steele respectfully requests that this Court declare that Ms. Steele's copyright registration for the Film is valid and enforceable.

### D.   Ms. Steele and Mr. Bell's contract to make the Film is enforceable, and Mr. Bell breached the contract.

This Court should order that Ms. Steele and Mr. Bell's agreement to make the Film is an enforceable contract, that Ms. Steele fulfilled all her obligations under this contract, and that Mr. Bell is in breach of this contract.

The elements of a cause of action for breach of contract are (1) existence of a contract between plaintiff and defendant; (2) plaintiff's performance under the contract; (3) defendant's breach of that contract; and (4) resulting damages.  *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (N.Y. Sup. Ct. 1996).

Ms. Steele and Mr. Bell had an agreement that Ms. Steele would be producer and director of the Film; the Film would be shot, edited, and completed in New York; the Film would feature Mr. Bell as the guide and interviewer; and Mr. Bell would obtain financing for the Film and underwrite certain expenses for the Film, thus serving in the role of executive producer (the "Film Agreement").  Steele Decl. ¶ 11.  Ms. Steele fully performed her obligations under the Film Agreement as producer and director of the Film carrying out various essential duties to ensure that the Film came to fruition.  *Id.* ¶¶ 15–20.  Mr. Bell, however, did not fulfill his obligations under the Film Agreement because he failed to raise the funding necessary to complete the Film, despite repeated inquiries from Ms. Steele.  *Id.* ¶¶ 35–38.  He also breached the Film Agreement by creating an unauthorized trailer of the Film in Australia, despite the fact

that Ms. Steele and Mr. Bell agreed that the entire film process would occur in New York under
Ms. Steele's direction.  *Id.* ¶ 50.

Therefore, Ms. Steele respectfully requests that this Court declare that the Film
Agreement is an enforceable contract, that Ms. Steele fulfilled all her obligations under this
contract, and that Mr. Bell is in breach of this contract.

### E.    Mr. Bell and the Milani Gallery infringed Ms. Steele's copyright in the Film.

This Court should order that Defendants infringed Ms. Steele's copyright in the Film by
creating multiple infringing works derived from the Film and displaying these works on
publicly-available websites, in print, and at the Tufts University Art Gallery.  Because
Defendants defaulted on discovery in this case, Ms. Steele is unaware as to whether additional
infringements were committed by Defendants.  The elements of a copyright infringement action
are "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that
are original."  *Dyer*, 2008 WL 2876494, at *3 (citing *Feist*, 499 U.S. at 361).  "The owner of
[the] copyright ... has the exclusive rights to do and to authorize" the designated uses of the
copyrighted work, such as reproducing, preparing derivative works, distributing, or displaying a
work.  17 U.S.C. § 106; *Davis v. Blige*, 505 F.3d 90, 98–99 (2d. Cir. 2007).

Ms. Steele is the sole owner of the copyright in the Film, and she has a certificate of
copyright registration with the Copyright Office that is presumed valid and enforceable.  *See
Dyer*, 2008 WL 2876494, at *3.  Therefore, Ms. Steele has the exclusive right to create a
derivative work from the Film.  *See Davis*, 505 F.3d at 98–99.

Without Ms. Steele's knowledge or authorization, Defendants copied footage from the
Film to create an unauthorized trailer from the Film (the "Unauthorized Trailer").  Because
Defendants defaulted on discovery, the actual date this work was created is unknown.  Steele
Decl. ¶ 50.  Defendants appear to have created the Unauthorized Trailer prior to a U.S. tour of

7

Mr. Bell's work coordinated by the American Federation of the Arts, which began in September 2011. *Id.* ¶¶ 57–58. On Mr. Bell's fraudulent copyright application for the Unauthorized Trailer, he claims he published the work on September 10, 2011. *Id.* ¶ 65 & Ex. H. Defendants also created an unauthorized still photograph from the Film (the "Unauthorized Photograph") (together with the Unauthorized Trailer, the "Infringing Works").

Defendants then displayed these Infringing Works on a national tour of Mr. Bell's work entitled the *Uz. vs. Them* tour, whose first stop was at the Tufts University Art Gallery ("Tufts Gallery"). *Id.* ¶¶ 57–58. The Unauthorized Trailer was shown at the Tufts Gallery as a single-channel video projection, running approximately two minutes, presented as a continuous loop in a large gallery space dedicated to Mr. Bell's work. Brennan Decl. ¶ 9. The Unauthorized Photograph was posted on the Tufts Gallery website to promote the tour. Steele Decl. ¶ 58. The AFA also began distributing an *Uz vs. Them* catalog, beginning on or about September 10, 2011. *Id.* ¶ 59 & Ex. F. Mr. Bell and the Milani Gallery also displayed the Infringing Works on the Milani Gallery's publicly-accessible Facebook profile and on the Milani Gallery's website in a section dedicated to Mr. Bell's work. *Id.* ¶¶ 53, 54 & Exs. C, D. The Unauthorized Trailer was also posted by Defendants on Vimeo.com, and Defendants gave various media outlets authorization to reprint or link to the Unauthorized Trailer. *Id.* ¶¶ 62, 75 & Ex. G. None of these displays provided any attribution to Ms. Steele as the copyright owner of the Film; rather, in each instance, Mr. Bell was listed as the copyright owner in an attempt to mislead the public about the ownership of the Film.

After receiving cease and desist letters from Ms. Steele's counsel, Defendants removed the Infringing Works from display for an appreciable period; Defendants later redisplayed the Infringing Works to the public on websites and through the *Uz vs. Them* exhibit catalog.

8

*Id.* ¶ 56.[1]  Therefore, not only did Defendants infringe on Ms. Steele's copyrighted work, but they did so willfully, on multiple occasions, with full knowledge that Ms. Steele held a copyright in the Film.  As of the date of this filing, these Infringing Works continue to be available to the public on the Milani Gallery website and the Milani Gallery's Facebook profile and on Vimeo.com at http://vimeo.com/30165982.  *Id.* ¶¶ 53, 54, 62 & Exs. C, D, G.

      Therefore, Ms. Steele respectfully requests that this Court declare that Defendants Mr. Bell and the Milani Gallery infringed Ms. Steele's copyright in the Film.

### F.    Mr. Bell's Copyright Registrations should be cancelled by the Copyright Office.

      This Court should declare that Mr. Bell's Copyright Registrations are invalid and shall be cancelled by the Copyright Office because the material covered by the registrations is not original; it belongs solely to Ms. Steele, and Ms. Steele never transferred any of these ownership rights to Mr. Bell.  Mr. Bell committed fraud on the Copyright Office by submitting a copyright application for the Film falsely identifying himself as the author of the Film.

      The Copyright Office will cancel a completed copyright registration under certain circumstances, including if the application "does not meet the requirements of the law and Copyright Office regulations," or if "it is clear that no registration should have been made because the work does not constitute copyrightable subject matter. . .".  37 C.F.R. § 201.7(b)(1).  If "the Copyright Office becomes aware after registration that a work is not copyrightable, either because the authorship is *de minimis* or the work does not contain *authorship subject to copyright*, the registration will be cancelled."  *Id.* § 201.7(c) (emphasis added).  The Copyright

---

[1] It is Ms. Steele's understanding that Tufts Gallery did not reopen the installation after it closed, and the AFA did not permit the other museums on the *Uz vs. Them* tour to display the Unauthorized Trailer or Unauthorized Photograph.  Steele Decl. ¶ 58.

Office only permits one copyright registration to be made for the same version of a particular work.  *Id.* § 202.3(b)(11).

Mr. Bell's copyright registrations relating to the Film are not original; rather, they were either copied from, or derivative of, the Film, to which Ms. Steele owns the exclusive copyright. Thus, Mr. Bell's copyright applications did not meet the requirements of the Copyright Office and did not contain "authorship subject to copyright."

U.S. district courts have held that a copyright registration is invalid and should be cancelled before the Copyright Office if the copyrighted material was not original and therefore not subject to copyright protection in the first place.  *See, e.g.*, *Psychopathic Records, Inc. v. Anderson*, No. 08-cv-15034, 2010 WL 4683470, at *2 (E.D. Mich. 2010) (citing *Feist*, 499 U.S. at 345) (declaring a copyright registration invalid because the registering party copied the design from a design created by someone else, and thus lacked any valid claim of ownership to the material); *see also Willsea v. Theis*, No. 98 Civ. 6773, 1999 WL 595629, at *9 n.10 (S.D.N.Y. 1999)§ ("It is not surprising that, upon discovery that the work was not original, the copyright would be voided.").

Here, Mr. Bell filed two copyright applications: one for the entire Film, and another for the Unauthorized Trailer, despite lacking any valid claim of ownership in this material: he first filed an application for the Unauthorized Trailer (Registration Number PA0001761068 for the Unauthorized Trailer, effective on October 25, 2011), and then filed an application for video footage of the Film (Registration Number PAu003580214, effective on November 7, 2011). Steele Decl. ¶¶ 65, 66 & Exs. H, J.  Both of the applications were filed months after Ms. Steele's application, and only after Ms. Steele notified Mr. Bell and the Milani Gallery to cease infringing her copyright in the Film.  *Id.* ¶ 55.  Mr. Bell's copyright registrations are not valid because the

10

material covered by the registrations is not original; it belongs solely to Ms. Steele, and Ms. Steele never transferred any of these ownership rights to Mr. Bell.

Moreover, Mr. Bell committed fraud on the Copyright Office by submitting two registration applications in his own name for a work that he did not create. *Id.* ¶¶ 65, 66.  Mr. Bell's two registration applications were materially and factually inaccurate because they both incorrectly designated Mr. Bell as the author of, and copyright owner of, the Film, when Mr. Bell was neither the author nor copyright owner of the work, and was thus ineligible to register any copyright in the Film. *Id.* ¶ 63.  In addition, Mr. Bell's copyright application for the Unauthorized Trailer fails to indicate that it is a derivative work based on the Film. *Id.* ¶ 65. The Copyright Office relied on the misleading and false material in Mr. Bell's registration when granting Mr. Bell's applications, and the public has suffered harm as a result of Mr. Bell's fraud. The remedy for this fraud should be cancellation of Mr. Bell's copyright registrations.

Therefore, Ms. Steele respectfully requests that this Court declare Copyright Registrations PA0001761068 and PAu003580214 invalid.  Given that Mr. Bell has defaulted in this action, this Court should direct that Ms. Steele is authorized to undertake any steps necessary to cancel such registrations at the Copyright Office.

### G.   Any agreements purporting to transfer any interest in the Film to Mr. Bell are null and void because Ms. Steele is the sole copyright owner in the Film.

This Court should order that any agreements that attempted to transfer any interests, (copyright or otherwise) in the Film to Mr. Bell are null and void because Ms. Steele is the sole copyright owner of the Film and thus the sole individual with the right to authorize use of the Film.

"The owner of [the] copyright ... has the exclusive rights to do and to authorize" the designated uses of the copyrighted work, such as reproducing, preparing derivative works,

distributing, or displaying a work.  17 U.S.C. § 106; *Davis v. Blige*, 505 F.3d 90, 98–99 (2d. Cir. 2007) ("[A]n owner may give a license to someone to exploit the work in some way, provided he owns that particular copyright interest.").  After Ms. Steele commenced this case, in an attempt to obtain copyright rights to the Film, upon information and belief, Mr. Bell prepared, or directed the preparation of, "Art Film Agreements" with a cameraman James Richards and an editor on the Film Soopum Sohn, purportedly to induce these individuals to transfer to Mr. Bell interests (copyright or otherwise) in the Film in exchange for money payment.  Steele Decl. ¶¶ 69, 70. These individuals did not possess any rights to the Film's copyright and had no authority to transfer any rights to Mr. Bell.  Ms. Steele is the sole copyright owner and, thus, the sole individual with the right to authorize use of the Film or transfer any copyright in the Film. Accordingly, these Art Film Agreements are invalid.

Therefore, Ms. Steele respectfully requests that the Court declare the "Art Film Agreements" null and void.

**H.     Defendants are barred from bringing a claim against Ms. Steele for enforcement of the Australian judgment, or seeking to obtain ownership of the computer and hard drive containing the Film, because these claims have been dismissed with prejudice.**

This Court should declare that Mr. Bell is forever barred from bringing a claim against Ms. Steele for enforcement of the judgment obtained by Mr. Bell in Australia, or seeking to obtain ownership of the computer and hard drive containing the Film, because the Court has dismissed these counterclaims with prejudice.  "A dismissal with prejudice has the effect of a final adjudication on the merits favorable to defendant and bars future suits brought by plaintiff upon the same cause of action."  *Nemaizer v. Baker*, 793 F.2d 58, 60–61 (2d Cir. 1986).

Defendants asserted various counterclaims against Ms. Steele in Defendants' Answer to Ms. Steele's Amended Complaint, filed on April 16, 2012, including for 1) enforcement of a

default judgment for Mr. Bell against Ms. Steele entered by the Federal Court of Australia on February 7, 2012, and 2) replevin and conversion for Ms. Steele's allegedly wrongful possession of a computer and hard drive containing footage from the Film.  Brennan Decl. ¶ 17 & Ex. E. On September 5, 2012, Defendants filed a motion to withdraw these counterclaims.  *Id.* ¶ 27.  On December 19, 2012, the Court denied Defendants' request that Defendants' counterclaims be dismissed without prejudice and ordered that Defendants' counterclaims be dismissed with prejudice within ten days of the issuance of the order unless the Court received notice that Defendants intended to withdraw their Motion to Withdraw Counterclaims.  *Id.* ¶ 34. Defendants did not submit notice that they intended to withdraw their Motion to Withdraw Counterclaims.  Therefore, the counterclaims were dismissed with prejudice.

Accordingly, Ms. Steele respectfully requests that this Court declare that Defendants' counterclaims have been dismissed with prejudice, and, accordingly, that Mr. Bell is forever barred from bringing claims against Ms. Steele in any court, in any jurisdiction, for enforcement of the Australian judgment or seeking to obtain ownership of the computer and hard drive. Furthermore, Ms. Steele respectfully requests that this Court declare that Ms. Steele is in rightful possession of the computer and hard drive containing the Film, and she is under no obligation to turn over such property to Mr. Bell.

## II.     Permanent Injunction

U.S. district courts may grant injunctions deemed "reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a); *Hounddog Prods., LLC v. Empire Film Group, Inc.*, 826 F. Supp. 2d 619, 632 (S.D.N.Y. 2011).  "A court may issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of

an injunction." *Realsongs, Universal Music Corp. v. 3A N. Park Ave. Rest. Corp.*, 749 F. Supp. 2d 81, 93 (E.D.N.Y. 2010).

To obtain an injunction, plaintiffs must demonstrate "(1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiffs and [defendants], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Hounddog*, 826 F. Supp. 2d at 632 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  Where a party has established a prima facie case of copyright infringement, irreparable harm is presumed.  *Realsongs*, 749 F. Supp. 2d at 93; *see also Hounddog*, 826 F. Supp. 2d at 633 (noting that irreparable harm may include a lost opportunity to capitalize on the public's interest in a film).

Courts have held that the public interest is served by issuing injunctions against copyright infringement, because "the object of copyright law is to promote the store of knowledge available to the public and to the extent that goal is met by providing financial incentives, the public's interest may well be already accounted for by the plaintiff's interest." *Hounddog*, 826 F. Supp. 2d at 633 (citing *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010)).

Here, there is a presumption of irreparable harm because Ms. Steele has established that Defendants infringed Ms. Steele's copyright in the Film by creating unauthorized derivative works using material from the Film and publicly displaying those Infringing Works. Defendants' infringing acts have harmed Ms. Steele because the Unauthorized Trailer is an inferior work and Ms. Steele was deprived of the opportunity to capitalize on the public's interest in the Film.  *See Hounddog*, 826 F. Supp. 2d at 633.  Although the Film was not complete, the Defendants created an inferior derivative work in the form of the Unauthorized Trailer, and

14

released it both on the Internet and at an established university museum.  Steele Decl. ¶¶ 53, 54, 57.  The Unauthorized Trailer was an inferior work because it was made using low quality sound, rather than the professional sound that was in Ms. Steele's sole possession.  *Id.* ¶ 50.  As a result, this Unauthorized Trailer gives the public a false impression that the full-length Film would be of a lesser quality.  Moreover, because Mr. Bell publicly claimed copyright ownership of the Unauthorized Trailer and Unauthorized Photograph, without mentioning Ms. Steele's name, the public has been confused as to the rightful author of the work and owner of the copyright.  *Id.* ¶ 51.  Mr. Bell further usurped the timing and location of the release of the Film, diminishing Ms. Steele's right to control the work.  All of Defendants' actions have diminished the value of the Film.

Second, there is no adequate remedy at law because Defendants' infringement is ongoing, and, despite repeated requests from Ms. Steele and her counsel, Defendants have refused to take down the Unauthorized Trailer and Unauthorized Photograph from the Internet since temporarily removing them for a period of time in October 2011.  *Id.* ¶ 56.  As of the time of this filing, these works continue to be posted online and available to any Internet user.  *Id.* ¶ 76.

The balance of hardships weighs in Ms. Steele's favor.  The harm to Ms. Steele is substantial because she was the producer, director, and author of the Film, and she generated the concept for the Film and devoted significant effort to its creation.  *Id.* ¶¶ 14–21.  In comparison, the harm to Defendants is minimal because Mr. Bell has now abandoned any interest in the Film, among other things, by defaulting in this case after appearing.  Brennan Decl. ¶ 35.  Likewise, the Milani Gallery has abandoned interest in the Unauthorized Trailer and Unauthorized Photograph, and the removal of these works will not have a significant impact on the gallery's business.  *Id.*

15

Finally, the public would benefit from the entry of a permanent injunction here.  The Unauthorized Trailer and Unauthorized Photograph should not be displayed as works of Mr. Bell.  Ms. Steele, as copyright owner, is entitled to control the display of her work.  Ms. Steele continues to suffer reputational harm due to Defendants' infringement of the Film.  Steele Decl. ¶¶ 60, 75.  Ms. Steele's ability to produce future films will be limited and the public's "store of knowledge" will be diminished.  *See Hounddog*, 826 F. Supp. 2d at 633 (citing *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010)) (noting that if a filmmaker plaintiff suffers financial losses due to defendant's copyright infringement, and as a result produces fewer motion pictures, the public's "store of knowledge" will be diminished.).   Until Defendants remove all displays of the Unauthorized Trailer and Unauthorized Photograph, these works will continue to confuse the public as to the rightful owner and author of the Film.  Moreover, the Unauthorized Trailer will continue to diminish the value of the Film because it is an inferior work that gives the public a false impression of the Film's quality.

Ms. Steele has demonstrated all factors required for the issuance of an injunction here.  Ms. Steele respectfully requests that this Court issue a permanent injunction (i) barring Defendants from using any aspect of the Film in any way, (ii) requiring Defendants to remove all existing infringing works from display in all forms of media, (iii) requiring Defendants to take reasonable efforts to regain copies of the infringing works that Defendants distributed to third parties, and (iv) requiring Defendants to turn over to Ms. Steele all copies of the Film and any infringing works within thirty (30) days of entry of the permanent injunctions.

## III.  Damages

Ms. Steele respectfully requests that the Court grant Ms. Steele the highest damage award to which she is entitled under the Copyright Act: actual damages pursuant to 17 U.S.C. § 504(b), or, in the alternative, statutory damages for willful infringement pursuant to 17 U.S.C.

§ 504(c)(2).  In addition, Ms. Steele respectfully requests that the Court grant Ms. Steele

attorneys' fees and costs pursuant to 17 U.S.C. § 505.

Under the Copyright Act, a copyright owner may receive either 1) actual damages

suffered as a result of the infringement and any additional profits of the infringer, or 2) statutory

damages.  17 U.S.C. § 504(a)–(b); *Shady Records, Inc. v. Source Enter., Inc.*, No. 03 Civ. 9944,

2005 WL 14920, at *20 (S.D.N.Y. Jan. 3, 2005).  The copyright owner may elect to recover an

award of statutory damages at any time before the final judgment is rendered.  17 U.S.C.

§ 504(c)(1).  In addition to damages, the court has discretion to allow any party to recover all

costs expended in the action, and the court may award a "reasonable attorney's fee to the

prevailing party."  17 U.S.C. § 505.

### A.     Actual Damages

Ms. Steele requests that this Court grant Ms. Steele actual damages of $240,000 pursuant

to 17 U.S.C. § 504(b) for the harm caused by Defendants' infringing use of Ms. Steele's

copyrighted work.

When calculating actual damages under Section 504(b), "the primary measure of

recovery is the extent to which the market value of the copyrighted work at the time of the

infringement has been injured or destroyed by the infringement."  *Rogers v. Koons*, 960 F.2d

301, 313 (2d. Cir. 1991) (quoting *Fitzgerald*, 807 F.2d at 1118).  In addition, Section 504(b)

allows a copyright owner to recover "any profits of the infringer that are attributable to the

infringement and are not taken into account in computing the actual damages."  17 U.S.C.

§ 504(b); *Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 470 (2d Cir. 1985) (noting that "it is

firmly established that an award consisting of both actual damages and defendant's profits does

not constitute double recovery, provided that, in calculating the award of defendant's lost profits,

the court subtract any amount directly related to and already accounted for in the actual damages award.").

1.      **Diminished Market Value of Film**

Ms. Steele proposes that the Court use the following method to calculate actual damages caused by Defendants' infringement of Ms. Steele's copyright: the initial market value of the Film at the time of Defendants' first known infringement, namely, on September 10, 2011, which Ms. Steele estimates to be $250,000, minus the current market value of the Film as of the time of this filing, which Ms. Steele estimates to be $30,000, for total actual damages of $220,000.  *See Rogers*, 960 F.2d at 313.

The initial market value of the Film was $250,000, an estimate based on the gross earnings of two documentary films comparable to the Film.[2]  Ms. Steele planned to license the Film to HBO's Documentary Division, which she expected would be interested in the Film because she had previously worked as an employee of the Documentary Division and had personal knowledge of the types of films that attracted HBO's interest.  Steele Decl. ¶ 13.  Ms. Steele also planned to promote the Film at film festivals such as the Sundance Film Festival, which would have helped Ms. Steele secure distribution of the Film throughout the United States and would have given Ms. Steele significant exposure as a filmmaker.  *Id.*  Had Defendants not infringed Ms. Steele's copyright in the Film, Ms. Steele would have been able to pursue these goals, and the Film would have maintained its market value of at least $250,000.  Depending on the success of the Film, the distribution of the Film could have recouped revenues substantially in excess of $250,000.  In addition, Ms. Steele and Mr. Bell had discussed licensing the work to

---

[2] This number is reasonable because it falls within a range of gross earnings from two documentaries comparable to Ms. Steele's Film, both of which were featured in the 2012 Sundance Film Festival and acquired by HBO Documentary Division: *Ai Weiwei: Never Sorry*, which grossed $534,100 domestically, and *Marina Abramovic: The Artist Is Present*, which grossed $86,637 domestically as of October 2012.  *See* Steele Decl. ¶ 71.

18

Australian television and selling the movie to art collectors.  *Id.*  The revenues from those potential sources are not included here.

Ms. Steele estimates that the current market value of the Film is only $30,000 based on certain out-of-pocket expenses incurred in making the Film.  *Id.* ¶ 73.  The value has been significantly diminished by Defendants' repeated wrongful use of unauthorized derivative works from the Film.  *Id.*  Defendants produced an Unauthorized Trailer using a rough cut of the Film, without professional quality sound.  *Id.* ¶ 50.  Defendants relied on a lesser-grade copy of the sound from the camera microphone.  *Id.*  The Unauthorized Trailer was of a much lower quality than what Ms. Steele would have produced for the Film or a trailer for the Film.  *Id.*  The inferior quality of the Unauthorized Trailer significantly diminishes the market value of the Film as a whole because it reduced the number of people interested in purchasing tickets to see the Film or purchasing a copy of the Film.  Given the dispute that arose from Mr. Bell's wrongful conduct, the Film will likely not attract Mr. Bell's built-in fan base.  *Id.* ¶ 72.  Furthermore, the reputational harm to the Film from Defendants' infringing use of the Film means that it is less likely that Ms. Steele will be able to license the documentary to HBO or any other media outlet. *Id.* ¶ 73.  Therefore, the Defendants' infringement caused significant harm to Ms. Steele's potential earnings from the Film, and the current market value of the Film is likely only $30,000.

### 2.    Defendants' Profits

Ms. Steele is also entitled to an award of Defendants' profits attributable to their infringing use of the Film.  17 U.S.C. § 504(b).  Because Defendants defaulted in this case, Ms. Steele was unable to conduct discovery on Defendants' profits, and thus must estimate Defendants' profits based on profits earned from Mr. Bell's prior works.  Among other uses, Mr. Bell used the Unauthorized Trailer as an art film installation in the Tufts Gallery and used the Unauthorized Photograph in a catalog sold during the tour of his artwork to reference the

Unauthorized Trailer.  Steele Decl. ¶¶ 57, 59.  The Unauthorized Trailer was shown at the Tufts

Gallery from sometime in September 2011 (potentially September 10, 2011, the date of first

publication on Mr. Bell's fraudulent copyright application) until the installation was closed after

Ms. Steele's counsel sent Tufts Gallery a cease and desist letter on October 22, 2011.  Brennan

Decl. ¶ 8.  The Unauthorized Trailer was displayed on the Internet and discussed in the catalog

accompanying Mr. Bell's U.S. art tour.  Steele Decl. ¶¶ 58, 59.  Because the Defendants

defaulted on discovery, the actual profits received by Mr. Bell and the Milani Gallery cannot be

determined.

In the recent past, according to information available on the Internet, Mr. Bell's paintings

have sold at auctions for in excess of $20,000.  *Id.* ¶ 74.  Therefore, at a minimum, Mr. Bell's

profits from displaying the Unauthorized Trailer as an art film installation were at a minimum

$20,000.

Accordingly, Ms. Steele respectfully asks that the Court grant Ms. Steele a total of

$240,000 in actual damages: $220,000 for the diminished market value of the Film and $20,000

for Defendants' wrongfully-earned profits.

**B.     Statutory Damages**

If the Court determines that actual damages are not available as a remedy, or that actual

damages would be less than the available award of statutory damages, Ms. Steele respectfully

requests that this Court grant Ms. Steele a statutory damage award of $150,000 pursuant to

17 U.S.C. § 504(c)(2) for Defendants' willful infringement of the Film.  Ms. Steele is eligible for

statutory damages because she elected to receive such relief in her Amended Complaint.

Brennan Decl. ¶ 16 & Ex. D at 23.

Pursuant to 17 U.S.C. § 504(c), a copyright owner may elect an award of statutory

damages "for all infringements involved in the action, with respect to any one work, for which

20

any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1).  Where the infringement was committed willfully, "the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2).

Here, Defendants' infringing acts were committed willfully and not innocently.  On multiple occasions throughout the film development process, Ms. Steele advised Defendants that she would not assign to them her copyright and that the Film could not be used under any circumstances without her permission.  Steele Decl. ¶ 41.  Without Ms. Steele's authorization, Defendants created a derivative work of the Film in the form of the Unauthorized Trailer. *Id.* ¶ 50.  Immediately upon learning of such wrongful conduct, on October 12, 2011, Ms. Steele's counsel sent Defendants cease and desist letters asking Defendants to refrain from displaying any footage or still photographs from the Film, and reiterating that Ms. Steele owned the copyright in the Film.  Brennan Decl. ¶ 4 & Exs. A, B.  Although Defendants took down the Infringing Works from the Milani Gallery website and Facebook profile between approximately October 19, 2011 and October 28, 2011, thereafter, they reposted the Infringing Works on those sites.  *Id.* ¶¶ 6, 11.  By continuing to engage in infringing acts even after receiving repeated warnings from Ms. Steele, Defendants committed willful infringement of Ms. Steele's copyright. *See N.A.S. Import, Corp. v. Chenson Enters., Inc*, 968 F.2d 250, 252–53 (2d Cir. 1992) (finding that a copyright infringer acted willfully by engaging in infringing acts after receiving cease and desist letters from the copyright owner).

Pursuant to 17 U.S.C. § 412, the remedy of statutory damages and attorneys' fees is available only where copyright registration is "promptly made."  *Arista Records LLC v. Lime*

*Group LLC*, No. 06 CV 5936, 2011 WL 1226277, at *4 (S.D.N.Y. Mar. 29, 2011) (citing *Love v. City of New York*, No. 88 CIV. 7562, 1989 WL 140578, at *1 (S.D.N.Y. Nov. 17. 1989)).  The legislative history of Section 412 indicates that its purpose is to encourage early registration of copyrights, because such registration was not compulsory.  *See Arista*, 2011 WL 1226277, at *4 (citing *Love*, 1989 WL 140578, at *1).

> **1.      This Court should deem July 11, 2011 to be the effective date of Ms. Steele's copyright registration.**

For the purposes of awarding Ms. Steele statutory damages, this Court should deem July 11, 2011 as the effective date of Ms. Steele's copyright registration.

The effective date of a copyright registration is the day on which the application, deposit and fee have been received in the Copyright Office.  17 U.S.C. § 410(d).  On July 11, 2011, Ms. Steele submitted her registration application, deposit, and fee with the Copyright Office (prior to discovery of Defendants' infringing use of the Film).  Steele Decl. ¶ 46 & Ex. A.  Ms. Steele filed an online copyright application for the Film as an unpublished work.  *Id.*  She uploaded the Film file onto the Copyright Office website and believed in good faith that her application was complete.  *Id.*  Ms. Steele had previously filed her own copyright applications for her screenplays, but did not have experience submitting electronic applications for a large file, such as a film, on the Copyright Office's website.  *Id.* ¶ 45.  The Copyright Office never notified Ms. Steele that her application was incomplete or that the Film file did not upload correctly.  *Id.* ¶ 47. Ms. Steele did not have any guidance from counsel when making her application.  *Id.* ¶ 45.  It was not until October 2011, after retaining counsel, that Ms. Steele learned the file had failed to upload correctly, perhaps because of its unusually large size and the amount of footage and sound included with the file.  *Id.* ¶ 48.  Two hard drives containing the Film were mailed to the Copyright Office by U.S. mail on October 22, 2011.  *Id.*

In light of Ms. Steele's *pro se* status at the time of her copyright application and lack of prior experience with copyright applications for films, Ms. Steele respectfully requests that this Court find that the effective date of Ms. Steele's copyright registration is July 11, 2011.  Indeed, Ms. Steele did just what Congress intended: she applied for copyright registration for the Film at the earliest opportunity.  July 11, 2011 is the day on which Ms. Steele's application, deposit and fee were received in the Copyright Office, so that is the date that should be considered as the effective date of her copyright registration.  *See* 17 U.S.C. § 410(d).  The Copyright Office denoted October 25, 2011, as the effective date, presumably because that was the date it received the hard drives containing the Film.  To the extent there was a glitch in the Copyright Office's uploading mechanism, which did not permit the Film to upload in connection with Ms. Steele's July 11, 2011 application (about which Ms. Steele was never informed), Ms. Steele should not be penalized by the assignment of a later effective date of the registration, which would impair Ms. Steele's right to statutory damages under the Copyright Act as of July 11, 2011.

Defendants' intentional infringing acts took place after Ms. Steele filed her copyright application on July 11, 2011.  Ms. Steele learned about Defendants' infringing use of the Film on or about October 12, 2011.  Steele Decl. ¶ 53.  Ms. Steele does not know the date when the Unauthorized Trailer and Unauthorized Photograph were created by Defendants because Defendants defaulted on discovery.  Brennan Decl. ¶¶ 31–35.  To the best of Ms. Steele's knowledge, Defendants' earliest infringing use of the Film occurred on September 10, 2011, the date listed as the date of publication on Mr. Bell's Copyright Registration for the Unauthorized Trailer.  Steele Decl. ¶ 65 & Ex. H.

Therefore, Ms. Steele respectfully asks that the Court consider July 11, 2011, as the effective date of Ms. Steele's copyright for the purposes of awarding statutory damages pursuant to 17 U.S.C. § 504(c).

> **2.**      **In the alternative, this Court should find that Defendants' recent repostings of the Unauthorized Trailer and Unauthorized Photograph on or about October 29, 2011 constitute a new series of infringements warranting an award of statutory damages.**

In the alternative, for the purposes of awarding statutory damages, the Court should find that Defendants' repostings of the Unauthorized Trailer and the Unauthorized Photograph on or about October 29, 2011 constitute a new series of infringements warranting an award of statutory damages to Ms. Steele.  The new set of infringing acts were distinct from the infringements that occurred before the effective date of Ms. Steele's copyright.

Several recent cases in the Second Circuit suggest that courts will award statutory damages for post-registration infringements if the plaintiff alleges sufficient facts to establish that the post-registration acts constitute a new series of infringements.  *See, e.g.*, *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 159 (2d. Cir. 2007) ("Congress understood section 412 to mean that a post-registration act of infringement will not be deemed to have commenced before registration if the infringing activity ceased for an appreciable period of time.  In such a case, the copyright owner could recover statutory damages and attorney's fees for that new, post-registration act of infringement"); *Kwan v. Schlein*, 246 F.R.D. 447, 453 (S.D.N.Y. 2007) ("It is arguable that publication of each edition marks the commencement of a new infringement for purposes of § 412, so that statutory damages and attorneys' fees would not be barred as to claims arising out of the most recent version . . .").

This Court should consider Defendants' repostings of the Unauthorized Trailer and the Unauthorized Photograph that occurred after the effective date of Ms. Steele's copyright as a

new series of infringements and award Ms. Steele statutory damages and attorneys' fees for such wrongful conduct.  On October 14, 2011, Ms. Steele's counsel sent cease and desist letters to Mr. Bell and the Milani Gallery asking them to refrain from displaying any footage or still photographs from the Film.  Steele Decl. ¶ 55.  The letters clearly indicated that Ms. Steele claimed the copyright in the Film and that she did not authorize the creation or display of the Unauthorized Trailer or Unauthorized Photograph.  *Id.*  On or about October 19, 2011, Defendants removed these Infringing Works from the Milani Gallery website and the Milani Gallery Facebook profile.  Brennan Decl. ¶ 6.  On this date, Ms. Steele's counsel acknowledged this removal in an e-mail to Defendants' Australian counsel.  *Id.* ¶ 5 & Ex. C.  Indeed, Vimeo's statistics on daily viewings of the Unauthorized Trailer, currently available at http://vimeo.com/30165982, show no views of the Unauthorized Trailer between October 19, 2011, and October 28, 2011, indicating that the video had been taken down from the Milani Gallery website and Facebook profile during those dates.  *Id.* ¶ 6.  On October 22 and 24, 2011, Ms. Steele's counsel also contacted third parties, the Tufts Gallery and American Federation of Arts, to ask them to remove the Unauthorized Trailer and Unauthorized Photograph from public display and to cease publication of the exhibit catalog.  *Id.* ¶ 8.  The Tufts Gallery closed the installation of the Unauthorized Trailer and removed the Unauthorized Photograph from the section of its website promoting the exhibit, and the AFA agreed not to display the Unauthorized Trailer at other locations in the *Uz vs. Them* tour.  Steele Decl. ¶ 58.

Ms. Steele's copyright in the Film was deemed effective by the Copyright Office on October 25, 2011.  *Id.* ¶ 49 & Ex. B.  Subsequently, Defendants reposted the Infringing Works onto the Milani Gallery website and Facebook profile.  Brennan Decl. ¶ 11.  By reposting the Infringing Works after an appreciable period, Defendants acted in willful defiance of Ms.

25

Steele's copyright.  Defendants committed this second set of infringements in a particularly

repugnant manner, and, accordingly, Defendants' reposting of the Infringing Works should be

viewed as a new series of infringements.

Therefore, Ms. Steele respectfully requests that this Court consider Defendants' post-

registration infringements as a new series of infringements, for the purposes of awarding

statutory damages pursuant to 17 U.S.C. § 504(c).

### 3.      Calculation of Statutory Damages

This Court should award Ms. Steele statutory damages in the amount of $150,000

pursuant to 17 U.S.C. § 504(c)(2).

The Copyright Act allows one award of statutory damages per "work" infringed,

regardless of the number of infringements of those works.  17 U.S.C. 504(c)(1); *WB Music Corp.

v. RTV Comm. Group, Inc.*, 445 F.3d 538, 540 (2d Cir. 2006).  District courts have wide

discretion in setting the amount of statutory damages.  *Bryant v. Media Right Prods., Inc.*, 603

F.3d 135, 143 (2d. Cir. 2010) (citing *Fitzgerald Publ'g, Co., Inc. v. Baylor Publ'g, Co., Inc.*, 807

F.2d 1110, 1115 (2d. Cir 1986)).

When determining the amount of statutory damages to award for copyright infringement,

courts may consider: "(1) the infringer's state of mind; (2) the expenses saved, and profits

earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on

the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning

the value of the infringing material; and (6) the conduct and attitude of the parties."  *Bryant*, 603

F.3d at 144 (citing *N.A.S. Impor. Corp. v. Chenson Enter., Inc.*, 968 F.2d 250, 252–53 (2d Cir.

1992)).  Courts in the Second Circuit have made it clear that statutory damages are intended "not

only to compensate injuries sustained but also to discourage wrongful conduct."  *Realsongs*, 749

F. Supp. 2d at 87 (awarding statutory damages in an amount nearly three times higher than

infringers' wrongful profits because infringers openly defied copyright owner's numerous communications and cease and desist letters).

Here, Defendants' willful infringement of Ms. Steele's copyright and lack of cooperation in the discovery process weigh strongly in favor of granting Ms. Steele the maximum statutory damage award.  To this day, the Infringing Works continue to be available to any user on the Internet on the Milani Gallery website and Facebook profile and on Vimeo.com.  Steele Decl. ¶¶ 53, 54, 62.   Furthermore, Defendants intentionally defaulted on their discovery.  Brennan Decl. ¶¶ 31–35.

The Defendants deprived Ms. Steele of controlling the first publication of the Film, confused the public as to the creator and owner of the work, and harmed the value of the work by releasing an inferior version of the Film that did not contain professional sound.  Therefore, an award of the maximum statutory damages is warranted because of Defendants' willful conduct and to deter such conduct in the future.  In light of Defendants' egregious behavior, Ms. Steele respectfully requests that this Court grant a statutory damage award of $150,000, the maximum amount of statutory damages available for infringement of a work under 17 U.S.C. § 504(c)(2).[3]

### C.    Attorneys' Fees and Costs

In addition to an award of statutory damages or actual damages, this Court should award Ms. Steele $445,305.87, the amount of attorneys' fees and costs expended by Ms. Steele's counsel in this action, because Ms. Steele is the prevailing party in this action and Defendants willfully infringed on Ms. Steele's copyright and unnecessarily prolonged this action.

---

[3] Even though both the Milani Gallery and Mr. Bell infringed Ms. Steele's copyright, Ms. Steele seeks only one statutory damage award because it appears that that the Defendants acted in concert.  *See* 17 U.S.C. § 504(c)(1); *Fitzgerald*, 807 F.2d at 1116.

Under the Copyright Act, the district court may, in its discretion, award attorneys' fees to the prevailing party.  17 U.S.C. § 505; *Twin Peaks Prods., Inc. v. Publications Int'l., Ltd.*, 996 F.2d 1366, 1383 (2d. Cir. 1993) (citing *Roth v. Pritikin*, 787 F.2d 54, 57 (2d Cir. 1992)) (noting that the standard for awarding attorneys' fees is "very favorable to prevailing parties" in copyright infringement actions).  Where the prevailing party is the plaintiff, attorneys' fees are awarded "as a matter of course."  *Whimsicality, Inc. v. Rubie's Costume Co., Inc.*, 891 F.2d 452, 457 (2d Cir. 1989).

Where a defendant's copyright infringement was willful or in bad faith, courts are more likely to order payment of attorneys' fees.  *See U2 Home Entm't, Inc. v. Lai Ying Music & Video Trading, Inc.*, No. 04 Civ. 1233, 2005 WL 1258917, at *7 (S.D.N.Y. May 25, 2005) (citing *Kepner-Tregoe, Inc. v. Vroom,* 186 F.3d 283, 289 (2d Cir. 1999)) ("A finding that a defendant's copyright infringement was willful can support the award of attorney's fees to the plaintiff.").

Here, Defendants willfully infringed Ms. Steele's copyright in the Film with full knowledge that Ms. Steele asserted copyright ownership in the Film, and in clear defiance of multiple requests to cease and desist from Ms. Steele and Ms. Steele's counsel.  Brennan Decl. ¶ 4.  Defendants removed the works from the Internet temporarily, but subsequently reposted the works following the date of Ms. Steele's registration and have since refused to remove them from the Internet.  *Id.* ¶ 11.  The works continue to be available in multiple locations to any user on the Internet.  Steele Decl. ¶¶ 53, 54, 62.

Moreover, Defendants' failure to cooperate in pre-trial matters has drawn out this dispute into an unnecessarily lengthy and costly litigation process that has lasted from October 2011 to the present.  Ms. Steele was required to send out multiple cease and desist letters to Defendants and third parties.  Brennan Decl. ¶¶ 4,8.  Ms. Steele tried to settle this dispute prior to

commencing this action, but Mr. Bell responded by commencing suit in Australia, a country Ms. Steele has never visited. *Id.* ¶ 12. After Ms. Steele commenced this action, she was required to obtain a court order permitting service via known e-mails. *Id.* ¶¶ 15–16. Ms. Steele and her counsel spent a substantial amount of time gathering her own paper and electronic documents responsive to Defendants' document requests, and served her own document requests and subpoenas on third parties. *Id.* ¶ 19. After the parties participated in a long mediation session on July 19, 2012 that lasted until after 10:00 pm at which the parties settled all claims, Ms. Steele and her counsel devoted substantial time to drafting a settlement agreement and accompanying documents. *Id.* ¶¶ 22–23. Defendants even wrote a letter to the Court declaring that "a settlement in principle has been reached." *Id.* ¶ 24. Nonetheless, having no notice or prior explanation from Defendants, Ms. Steele's counsel learned from a court-appointed mediator that Defendants unilaterally abandoned the settlement. *Id.* ¶ 25. Ms. Steele was compelled to restart discovery, although her repeated requests for documents and depositions were unanswered. *Id.* ¶¶ 31–35. Defendants even stopped communicating with their own counsel. *Id.* ¶ 32. After failing to appear at a telephone conference scheduled by the Court, Defendants have defaulted in this action. *Id.* ¶ 35. Because of Defendants' uncooperativeness and dilatory efforts, Ms. Steele's counsel has spent nearly 700 hours of time on this action. Between October 2011 and March 2013, Ms. Steele's counsel spent 679.7 hours having a value of $441,383 at the firm's regular rates. *Id.* ¶ 38. Over this period, Ms. Steele's counsel dealt with two sets of intellectual property lawyers representing Mr. Bell and the Milani Gallery. *Id.* ¶ 39.

For all these reasons, Ms. Steele respectfully requests that this Court grant Ms. Steele $445,305.87 ($441,383 in attorneys' fees and $3,922.87 in other costs related to her representation), pursuant to 17 U.S.C. § 505. This amount is reasonable because it falls within

29

the range of the average attorneys' fees in a copyright litigation.  *See, e.g.*, *Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 594 F. Supp. 2d 931, 935 (2009) ($760,000 average fees through the close of discovery); *JCW Invs., Inc. v. Novelty, Inc.*, 366 F. Supp. 2d 688, 690 (N.D. Ill. 2005) ($376,580 to $616,170 average fees through trial).

## **CONCLUSION**

WHEREFORE, Ms. Steele respectfully requests that this Court grant Ms. Steele the relief requested and any such other and further relief in law and equity as to which Ms. Steele may be entitled.

30

501107993v8

Dated:  New York, New York
      April 5, 2013

                      Respectfully submitted,

                      PILLSBURY WINTHROP SHAW PITTMAN LLP

                  By:   /s/ Kerry A. Brennan
                      Kerry A. Brennan
                      1540 Broadway
                      New York, NY 10036-4039
                      212.858.1000

                      *Attorneys for Plaintiff*

31