USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/28/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

TANYA STEELE,

                  Plaintiff,

    -v-

RICHARD BELL and JOSH MILANI
GALLERY PTY. LTD.,

                  Defendants.

-----------------------------------------------------------X

No. 11 Civ. 9343 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

This case involves a dispute over the rights to a film that Plaintiff Tanya Steele, a Brooklyn-based filmmaker, directed and produced. On May 16, 2013, the Court ordered the Clerk of Court to enter a default against Defendants and referred the case to Magistrate Judge Ellis for an inquest on damages and other relief. The Court has received Judge Ellis's Report and Recommendation ("R & R") and Plaintiff's objections to the R & R. For the following reasons, the Court overrules Plaintiff's objections and adopts the March 3, 2014 R & R in its entirety.

## BACKGROUND

The R & R provides a thorough description of the facts and procedural history of this case. (R & R at 2-6.) The Court therefore sets out only those facts necessary to resolve Plaintiff's objections.

Plaintiff entered into an oral agreement with Defendant Richard Bell to create a short film entitled "Blackfella's Guide to New York City" ("the Film"). (Declaration of Tanya Steele, April 5, 2013 ("Steele Decl.") ¶¶ 10-11.) Plaintiff was to serve as the producer and director, and

Bell—an Australian artist—played the main role in the Film and agreed to underwrite its expenses. (Id. ¶ 11.) Filming was completed in May 2010, and in December 2010 Plaintiff sent a "rough cut" of the footage to Bell and Josh Milani, Bell's exclusive dealer and the owner of the gallery named as the other Defendant in this action. (Id. ¶¶ 24, 33.)

At this point, the parties' relationship began to deteriorate. Bell and Milani were largely unresponsive to Plaintiff's communications until May 2011, when Bell suggested that Plaintiff retain an Australian editor to work on the Film. (Id. ¶¶ 33, 37-39.) Plaintiff declined and, after discussions with Bell and Milani about transferring her copyright in the Film, made clear that she was not turning over the copyright and that Defendants were not to use the Film without her permission. (Id. ¶¶ 39-41.) The Film was never completed, because Plaintiff "did not have the funds to complete its post-production" and, although she considered raising the funds, she thought she "would hear back from Mr. Bell." (Id. ¶ 38.)

Plaintiff attempted to register her copyright in July 2011. (Id. ¶ 46.) The Copyright Office did not receive all of the components required for her registration until October 25, 2011, however, and therefore issued her a registration effective on that date. (Id. ¶ 48-49.) Plaintiff asserts that the file she initially submitted containing the Film did not upload correctly, (id. ¶ 48), and—as described further below—asks the Court to deem her registration effective as of July 11, 2011.

According to Plaintiff, beginning in September 2011 Defendants used content from the Film in several ways. Bell displayed a two-minute trailer from the video ("the Trailer") during a tour of his work sponsored by the American Federation of Arts ("AFA"), the first stop of which was Tufts University. (Declaration of Kerry A. Brennan, April 5, 2013 ("Brennan Decl.") ¶ 7; Steele Decl. ¶¶ 57-58.) After Plaintiff's counsel sent cease-and-desist letters, both Tufts and the

2

AFA agreed that they would not display the Trailer. (Brennan Decl. ¶¶ 8-10.) Additionally, Defendants uploaded the Trailer to the video-hosting website Vimeo, and provided links to the Trailer from Defendant Milani Gallery's website and Facebook pages. (Brennan Decl. ¶ 3; Steele Decl. ¶ 53.) Defendants also posted a still photograph from the Trailer on these websites. ("the Photograph"). (Steele Decl. ¶¶ 52-53.) Although the Trailer and Photograph were removed from these websites for nine days after Plaintiff's counsel sent cease-and-desist letters, the infringing content was subsequently re-posted. (Brennan Decl. ¶ 6.)

Plaintiff commenced the instant action on December 20, 2011. (Dkt. no. 1.) Defendants, through counsel, answered; the parties began discovery; and they even reported to the Court that they had reached a settlement in principle. (Brennan Decl. ¶¶ 14-24.) Defendants abandoned the settlement, however. After their counsel moved to withdraw, they chose not to appear further in the action and the Court found them in default. (Dkt. nos. 32-33; Brennan Decl. ¶¶ 25-37.) On May 16, 2013, the Court referred the case to Judge Ellis for an inquest into damages and other relief. (Dkt. no. 42.)

Judge Ellis's R & R recommended that Plaintiff's request for declaratory relief be granted in part and that the Court issue the following declarations: that Steele is the sole author of the Film; that she is the sole copyright owner; that Defendants infringed her copyright in the Film; and that any agreements between Defendants and third parties purporting to transfer rights in the Film are void because Steele is the sole owner. (R & R at 9-13.) Judge Ellis also recommended that the Court permanently enjoin Defendants "from using any aspect of the Film in any way, including, but not limited to, the Unauthorized Trailer and Unauthorized Photograph," and order them "to remove all existing infringing works and take reasonable efforts to regain copies of the infringing works that Defendants distributed to third parties." (Id. at 15

3

(quoting Pl.'s Mem. of Law at 2).) Finally, the R & R recommended that Plaintiff's requests for monetary damages and attorney's fees be denied. Judge Ellis concluded that Plaintiff had failed to establish that she suffered actual damages or that Defendants had profited from their use of the Film. (Id. at 16-17.) The R & R further reasoned that under the Copyright Act, owners may recover damages for infringement of unpublished works only for distinct instances of infringement committed after the copyright was registered. Because Defendants began infringing before the copyright was registered and removed the infringing content only for a matter of days, Judge Ellis concluded, they did not engage in a "new series of infringement warranting statutory damages and attorney's fees" even though their infringement continued past the date the copyright was registered. (Id. at 21.)

## DISCUSSION

Plaintiff objects to Judge Ellis's recommendation that she had failed to establish the amount of her actual damages or Defendants' profit from the infringement. (Pl.'s Objections at 1.) She also challenges the R & R's conclusion that she was not entitled to statutory damages or attorney's fees. In particular, she asserts that the effective date of her copyright was July 11, 2011—the day when she first attempted to file her application—instead of October 25, 2011, the date the Copyright Office designated as the effective date of her copyright registration. (Id.) She also argues that even assuming her registration was not effective until October 25, 2011, Defendants' infringements after that date should constitute a new series of infringement, giving rise to statutory damages and attorney's fees. (Id.)

The Court reviews *de novo* those portions of the R & R to which the parties have objected, 28 U.S.C. § 636(b)(1), and it reviews for clear error those portions of the R & R to which the parties have not objected, see DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 339

(S.D.N.Y. 2009).

1. **Statutory Background**

In the 1976 amendments to the Copyright Act, Congress no longer required owners to register their works to receive copyright protection, but nonetheless recognized that registration is "useful and important to users and the public at large." H.R. Rep. No. 94-1476, at 158 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5774. To encourage registration, Congress provided that owners of unpublished works[1] could recover statutory damages and attorney's fees only for instances of infringement that occurred after registration. See 17 U.S.C. § 412(1). The "remedies ordinarily available in infringement cases"—including "an injunction on terms the court considers fair" and "actual damages plus any applicable profits not used as a measure of damage"—would continue to remain available for infringement that occurred prior to registration. H.R. Rep. No. 94-1476, at 158.

Accordingly, "at any time before final judgment is rendered" a copyright owner may elect to receive either (1) actual damages plus defendant's profits or (2) statutory damages, which, in the case of infringements committed "willfully," may amount to $150,000 per work infringed. 17 U.S.C. § 504(c). Here, because Plaintiff has not clearly articulated which type of damages she elects—she seeks "the highest damage award to which she is entitled under the Copyright Act," (Pl.'s Objections at 8)—the Court considers both actual and statutory damages.

2. **Whether Plaintiff Is Entitled to Actual Damages and Defendants' Profits**

A copyright owner "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). The

---

[1] Plaintiff recognizes that her work is "unpublished." (See, e.g., Pl.'s Objections at 6, 14.)

"primary measure" of actual damages "is the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement." Fitzgerald Publ'g Co. v. Baylor Publ'g Co., 807 F.2d 1110, 1118 (2d Cir. 1986). Ascertaining this figure necessarily "require[s] the court to make uncertain estimates" based on "circumstances that are counterfactual." On Davis v. The Gap, Inc., 246 F.3d 152, 166-67 (2d Cir. 2001). At the same time, however, actual damages must not be "based upon undue speculation," Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 570 (2d Cir. 1985), and must bear "a necessary, immediate and direct causal connection" to the infringement, Big Seven Music Corp. v. Lennon, 554 F.2d 504, 509 (2d Cir. 1977).

Here, Plaintiff asserts that she is entitled to $240,000 in actual damages: $220,000 in loss of market value of the Film plus $20,000 in profits Defendants allegedly earned. (Pl.'s Mem. of Law at 20; Pl.'s Objections at 12.) Judge Ellis concluded that Plaintiff failed to offer evidence sufficient to sustain any award of actual damages. (R & R at 17.) The Court agrees.

Consider first Plaintiff's estimate of diminution in market value. She asserts that the Film had a market value of $250,000, which was reduced to $30,000 after the infringement. (Steele Decl. ¶¶ 71, 73.) The initial $250,000 figure is "based on the gross earnings of two recent documentaries in line with [Plaintiff's] goals for the Film," which grossed $534,100 and $86,637 in the United States. (Id. ¶ 71.) Plaintiff further notes that she had intended to license the Film to HBO's Documentary Decision, "which she expected would be interested in the Film because she had previously worked as an employee of the Documentary Division and had personal knowledge of the types of films that attracted HBO's interest." (Pl.'s Objections at 10.)

The Court is hesitant to accept the $250,000 figure. It appears to be nothing more than an arbitrary point on the considerable spread in gross earnings between two films that were not

6

produced by Plaintiff. Perhaps more significantly, by Plaintiff's own admission the Film "was not completed" because she "did not have the funds to complete its post-production," although she considered raising them. (Steele Decl. ¶ 38.) That the Film is incomplete adds another level of speculation: not only is it uncertain whether HBO (or some other third party) would purchase a license to the Film, it is also uncertain whether Plaintiff could obtain the funds to—and ultimately would—complete the Film in the first place.

Even assuming that Plaintiff's estimate of the Film's $250,000 initial market value is adequately supported in the record, however, her claim that Defendants' acts reduced that value to $30,000 is not. Plaintiff's declaration asserts that she "was told" by "documentary filmmakers" that "it would be extremely difficult to find any media outlet interested in the Film because of the creation and distribution of the Unauthorized Trailer, which has likely already been viewed by Mr. Bell's fan base." (Steele Decl. ¶ 72.) Insofar as this statement suggests that Bell's fans would not view the Film because they will have already seen a two-minute trailer, such an assertion is implausible and, it seems, runs contrary to the purpose of a trailer.

Noting that the Trailer was created "without professional quality sound," Plaintiff frames the issue somewhat differently in her Objections to the R & R. (Pl.'s Objections at 11 (citing Steele Decl. ¶ 50).) Without any citation, Plaintiff asserts that the "inferior quality of the Unauthorized Trailer significantly diminishes the market value of the Film as a whole because it reduced the number of people interested in purchasing tickets to see the Film or purchasing a copy of the Film." (Id. at 11.) Although not as implausible as Plaintiff's other assertion, this argument rests on too many unsupported assumptions: that Plaintiff would have obtained the funds to complete the Film and would have done so; that a group of individuals would have purchased a copy of the Film or tickets to see it; and that the quality of the Trailer was so poor

that it would have caused at least some of these individuals to change their mind about seeing the Film. Without some modicum of evidentiary support, the Court declines to accept each of these premises. To be sure, "[u]ncertainty will not preclude recovery of actual damages if the uncertainty is as to amount, not as to whether actual damages are attributable to the infringement." 5 Nimmer on Copyrights § 14.02[A][3]. But this is not an instance of mere "difficulty in quantifying the damages attributable to infringement"; rather, Plaintiff has failed to establish "the fact that actual damages are attributable to the infringement." Davis, 246 F.3d at 167.[2]

Plaintiff's claim to profits Defendants allegedly earned from the infringement is equally speculative. She asserts that Defendants displayed the Trailer in connection with the first stop on a U.S. tour of Bell's artwork; that "according to information available on the Internet, Mr. Bell's paintings have sold at auctions for in excess of $20,000"; and that therefore, "at a minimum, Mr. Bell's profits from displaying the Unauthorized Trailer as an art film installation were at a minimum $20,000." (Pl.'s Objections at 11-12.)

The Copyright Act requires the copyright owner "to present proof only of the infringer's gross revenue," then shifts the burden to the infringer "to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). The Second Circuit has clarified, however, that "the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelated revenues." Davis, 246 F.3d at 150.

Here, Plaintiff's assertion that Bell has sold paintings for over $20,000—without a

---

[2] Plaintiff also asserts that Bell's "built-in fan base" might boycott the Film and that "the reputational harm to the Film from Defendants' infringing use" of it makes it "less likely that Ms. Steele will be able to license the documentary to HBO or any other media outlet." (Pl.'s Objections at 11.) These assertions are similarly unsupported in the record.

description of when those paintings were sold or how they were related to the Trailer—is too tenuous to support an award of profits. And although Defendants defaulted before Plaintiff had the opportunity to obtain discovery, Plaintiff has failed to provide the Court with any basis for concluding that Defendants profited from the infringement. For example, Plaintiff's counsel reportedly spoke to representatives from Tufts Gallery and the AFA—the institutions that hosted and organized the U.S. tour of Bell's artwork, (Brennan Decl. ¶¶ 9-10)—but did not offer evidence about whether either institution charged an admission fee to Bell's exhibition.[3] Indeed, the evidence that Plaintiff did present suggests that Defendants made little, if any, profit from their infringement: Plaintiff provided Defendant with only a "rough cut" of the Film "in a format in which the video and sound could not be altered," (Steele Decl. ¶ 33); that incomplete video, as Plaintiff emphasizes, contained nonprofessional sound, (Id. ¶ 50); and a representative from the AFA informed Plaintiff's counsel that the AFA "had understood that Bell would be providing a film for use in the exhibit and that it had been disappointed when a 'trailer' had been provided instead of a film," (Brennan Decl. ¶ 10). Nothing in the record suggests that Defendants attempted to sell the Film, the Trailer, or the Photograph or that they earned any profits as a result of these infringements. The Court therefore concludes that Plaintiff is not entitled to the $20,000 in Defendants' profits that she seeks.

3.      **Whether Plaintiff Is Entitled to Statutory Damages and Attorney's Fees**

As described above, the Copyright Act provides that "no award of statutory damages or of attorney's fees . . . shall be made for any infringement of copyright in an unpublished work

---

[3]      Plaintiff's Objections also assert that Bell "used the Unauthorized Photograph in a catalogue sold during the tour of his artwork to reference the Unauthorized Trailer." (Pl.'s Objections at 11.) The paragraphs of Plaintiff's declarations cited to support this proposition, however, state only that the AFA "prepared a book/catalog" to accompany the exhibition of Bell's artwork and that the AFA "began distributing" this catalog "on or about September 10, 2011." (Steele Decl. ¶ 59.) Nowhere does the declaration—or anything else in the record—say that the catalogue was "sold," much less attempt to compute the profits such sales would have generated.

commenced before the effective date of its registration." 17 U.S.C. § 412(1). The "effective date of a copyright registration" is "the day on which an application, deposit, and fee, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, have all been received in the Copyright Office." Id. § 410(d).

To be entitled to statutory damages and attorney's fees, Plaintiff must therefore show an instance of infringement that occurred after the Copyright Office received all the components of her application. Because Plaintiff asserts that "Defendants' earliest infringing use of the Film occurred on September 10, 2011," (Pl.'s Objections at 16), the effective date of her copyright registration is crucial. If, as Plaintiff argues, the effective date of her registration is July 11, 2011 (the date she first attempted to submit her registration), the infringement post-dated her registration and she is entitled to statutory damages and attorney's fees. After considering this question, the Court agrees with Judge Ellis that Plaintiff's registration was not effective until October 25, 2011. It further concludes that the posting of the Trailer and Photograph that occurred after October 25, 2011, did not constitute a separate, actionable instance of infringement.

### A. The Effective Date of the Registration

Plaintiff's initial declaration stated that she applied for a copyright on July 11, 2011 through the Copyright Office's website; that she did so by completing the application, paying the fee, and uploading the movie file (known as her "deposit"); that she believed that her application was complete; and that she was never contacted by the Copyright Office and told otherwise. (Steele Decl. ¶ 46.) She attaches what she refers to as a "true and accurate copy of [her] application indicating the July 11, 2011 date [she] completed all requirements of the application." (Id.) The printout Plaintiff provides from the Copyright Office's website,

however, does not indicate that her application was complete.  Instead, it states that the claim was "opened" on July 11, 2011; that an attachment—what appears to be a .pdf file—was uploaded on July 11, 2011; and that her "claim status" was "pending."  (Id. Ex. A.)  Plaintiff further asserts that in October 2011 her counsel "checked the Copyright Office website records" and advised her that the deposit "had not been fully uploaded, perhaps because the file was too large."  (Id. ¶ 48.)  She and her counsel then mailed a copy of the footage to the Copyright Office, which issued her a copyright registration with an effective date of October 25, 2011.  (Id. & Ex. B.)

  Judge Ellis recommended rejecting Plaintiff's argument and concluding that the effective date of her registration was October 25, 2011.  He emphasized Plaintiff's acknowledgement that she had "previously filed online copyright applications with the U.S. Copyright Office for screenplays."  (R & R at 19 (quoting Steele Decl. ¶ 45).)  Moreover, he recognized that the printout showed Plaintiff's "claim status" as "pending," and noted that Plaintiff had failed to offer any authority that would permit a Court to alter the effective date of a copyright based on equitable principles.  (Id.)

  Following the issuance of the R & R, Plaintiff submitted a supplemental declaration, stating that prior to the instant application she "had no experience applying for copyrights online," and that the statement to the contrary in her earlier declaration "was an inadvertent error."  (Supplemental Declaration of Tanya Steele, March 20, 2014 ("Supp. Steele Decl.") ¶¶ 2-3.)  She adds another piece of information, averring that "shortly after filing a copy of [her] application" she called the Copyright Office and "was told that [she] would receive a copyright within three months of filing."  (Id. ¶ 5.)

  Despite the additional evidence Plaintiff has submitted, the Court agrees with Judge Ellis

that—at least in the circumstances of this case—it cannot adjust the effective date of Plaintiff's copyright registration based on equitable principles.

At the outset, the text of the statute is clear: the effective date of a registration is the date on which the application, fee, and deposit—which are later determined "to be acceptable for registration"—are received in the Copyright Office. 17 U.S.C. § 410(d). Plaintiff acknowledges that her deposit "had not fully uploaded," (id. ¶ 6); she has thus failed to demonstrate that the Copyright Office "received" a deposit that was "acceptable for registration" on July 11, 2011.

The limited authority addressing when an application is "received" supports this conclusion. A regulation promulgated by the Registrar of Copyrights explains: "Contact with the registration applicant may be necessary if the Copyright Office cannot access, view, or examine the content of any particular digital file that has been submitted for the registration of a work. For purposes of section 410(d) of 17 U.S.C., a deposit has not been received in the Copyright Office until a copy that can be reviewed by the Office is received." 37 C.F.R. § 202.20(b)(2)(iii)(D). Additionally, the legislative history accompanying Section 410(d) provides that when the application, fee, and deposit "are received at different times the date of receipt of the last of them is controlling, regardless of when the Copyright Office acts on the claim." H.R. Rep. 94-1476, at 157. These statements evince an intent to create a bright-line rule: a copyright registration is effective only when the Copyright Office receives a completed application that it later deems acceptable for registration.

The D.C. Circuit, in an opinion by now-Chief Justice Roberts, addressed a similar timing provision in a different Copyright Office regulation. See Universal City Studios LLLP v. Peters, 402 F.3d 1238 (D.C. Cir. 2005) (Roberts, *J.*). The regulation in Universal City required copyright owners to submit a certain claim form to the Copyright Office and that the form be (1)

12

received by the Copyright Office in July or (2) shown to have been mailed in July by virtue of a U.S. Post Office date-stamped receipt (but not by any other evidence). Id. at 261. Two film studios, whose claims were rejected because the Copyright Office did not receive them until August, asserted that they mailed their forms on July 30 and submitted all manner of evidence—other than a U.S. Post Office date stamp—to prove it. The D.C. Circuit held that the regulations were intended to avoid "precisely the type of factual inquiry" that the studios sought, and concluded that the Copyright Office did not violate the Copyright Act, the Administrative Procedure Act, or the Due Process Clause by denying the claims as untimely. Id. at 262-65.

The regulations and legislative history surrounding Section 410(d)—the provision at issue here—do not explicitly seek to avoid fact-intensive inquiries they way they did in Universal City. The case is nonetheless instructive because it affirms the authority of the Copyright Office to balance the equities of a certain case against the need to create bright-line rules. The number of copyright registrations filed each year and the innumerable ways in which an application could become lost during transmission to the Copyright Office make such a bright-line rule particularly appropriate here. Perhaps even more importantly, Plaintiff has not cited a single case in which a Court retroactively adjusted the effective date of an owner's copyright registration. Because Plaintiff has not shown that the Copyright Office received a reviewable copy of her film before October 25, 2011, the Court concludes that the effective date of her registration is October 25, 2011.

### B.  Whether a Separate Instance of Infringement Occurred After Registration

Plaintiff argues in the alternative that even if the effective date of her registration is October 25, 2011, she is still entitled to statutory damages and attorney's fees. This argument rests on Plaintiff's assertions that on October 19, 2011, Defendants removed the Trailer and

Photograph from the Milani Gallery website and Facebook page after Plaintiff's counsel wrote cease-and-desist letters, but that on October 28, 2011, Defendants re-posted the infringing content. (Pl.'s Objections at 17.) Plaintiff thus asserts that the re-posting of the infringing content—which occurred after her registration—amounts to a separate, actionable instance of infringement. (Id. at 16-17.)

A number of courts in this District, however, have considered and rejected a similar argument. Repeatedly, these courts have concluded that "Section 412 imposes a bright-line rule, barring the recovery of statutory damages for infringement occurring after registration if that infringement is part of an ongoing series of infringing acts and the first act occurred before registration." U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc., No. 04 Civ. 6189(JFK), 2008 WL 3906889, at *15 (S.D.N.Y. Aug. 21, 2008); see Peterson v. Kolodin, No. 13 Civ. 793(JSR), 2013 WL 5226114, at *8 (S.D.N.Y. Sept. 10, 2013) ("[W]here the alleged infringement begins before registration and continues after registration, statutory damages and attorney fees are still unavailable."); Silberman v. Innovation Luggage, Inc., No. 01 Civ. 7109(GEL), 2003 WL 1787123, at *9 (S.D.N.Y. Apr. 3, 2003) ("[A]s long as infringement commenced before the date of registration, statutory damages and attorney's fees are barred even if infringement continued after the date of registration.").

That Defendants were informed of the infringing content and removed it temporarily does not change this analysis. In Shady Records, Inc. v. Source Enterprises, Inc., No. 03 Civ. 9944(GEL), 2005 WL 14920 (S.D.N.Y. Jan. 3, 2005), then-District Judge Lynch addressed nearly indistinguishable circumstances. Defendants in Shady Records re-posted infringing content approximately one month after the effective registration of the relevant copyright and after receiving cease-and-desist letters. Id. at *3, *20. Judge Lynch concluded that the re-

posting was "nothing more than the continuation of the series of acts" that began with pre-registration infringement and held that statutory damages and attorney's fees were unavailable. Similarly, in U2 Home Entertainment, defendants began distributing copyrighted television programs before the copyrights were registered and continued after registration, with "the periods between pre- and post-registration acts of infringement" for the infringing titles "ranging from eight days to slightly more than two years." 2008 WL 3906889, at *15. Concluding that Section 412 imposed a "bright-line rule," Judge Keenan held that plaintiff could not recover statutory damages or attorney's fees even for post-registration acts of infringement. Id.; see also Ez-Tixz, Inc. v. Hit-Tix, Inc., 919 F. Supp. 728, 731, 736 (S.D.N.Y. 1996) (precluding an award of statutory damages and attorney's fees where defendants continued to use infringing software after registration and after being informed that they were required to pay a royalty fee); Singh v. Famous Overseas, Inc., 680 F.Supp. 533, 534-36 (E.D.N.Y. 1988) (concluding that post-registration sales of copyrighted songs constituted a continuing act of infringement), aff'd without opinion, 923 F.2d 845 (2d Cir. 1990).

Here, Plaintiff does not cite any of these cases, much less attempt to distinguish them. Instead, she relies heavily on the Second Circuit's opinion in Troll Co. v. Uneeda Doll Co., 483 F.3d 150 (2d Cir. 2007), which interpreted the concept of "continuing infringement" in the context of a different provision of the Copyright Act. Defendant in that case began producing the well-known "Troll" dolls when the copyright was in the public domain; it stopped producing the dolls for a period of nine or ten years, during which time plaintiff restored the copyright. Id. at 152-54. When defendant resumed production of the dolls, plaintiff sued for infringement. Id. at 153-54. Defendant claimed it was entitled to "reliance party status" under Section 104A of the Copyright Act, which provided a grace-period to sell off existing inventory for individuals who

had "continue[d]" to infringe after a copyright was restored from the public domain. Id. at 156-57 (quoting 17 U.S.C § 104A(h)(4)).  In determining the appropriate construction of the term "continued," the Second Circuit looked to Section 104A's legislative history, which in turn referenced the "continuing infringement doctrine" of Section 412 (the section relevant here). Id. at 158.  The Circuit concluded that "Congress understood section 412 to mean that a post-registration act of infringement will not be deemed to have commenced before registration if the infringing activity ceased for an appreciable period of time." Id. at 158-59.  Because defendant had ceased production "for a non-trivial period of time"—nine or ten years—the Court concluded that its infringement had not been continuing. Id. at 159.

Even construed most charitably to Plaintiff, Troll stands for the straightforward proposition that an infringement is not "continuing" if the infringer's activities have "ceased for an appreciable period of time." See id. at 159.  Whereas defendant in Troll ceased its infringing activity for nine or ten years, in this case Defendants removed the infringing content for only nine or ten days.  (See, e.g., Pl.'s Objections at 16-17.)  That period is simply not "appreciable." See U2 Home Entm't, 2008 WL 3906889, at *15 (rejecting application of Troll, calling it "distinguishable on its facts," when defendants ceased infringement for only eight days to two years after registration).  Indeed, Troll itself supports such a conclusion.  The Court there noted that defendant "would have been a reliance party" with respect to infringing sales made in 1995, after the copyright was restored on December 8, 1994. Id. at 159.  Stated differently, Troll reasoned that an infringement would be "continuing" if resumed after a delay of twenty-four days (and potentially as long as one year).  The delay of nine or ten days in this case comfortably falls within the parameters established by Troll.

One might argue that construing the concept of "continuing infringement" in this way

allows defendants to infringe with impunity, as long as their infringement began before the copyright's effective date. This argument misses the mark. A defendant who continues infringing after registration will be subject to liability for actual damages, disgorgement of profits, and—as is the case here—an appropriately-tailored injunction. The Court agrees with Judge Keenan's reasoning in U2 and Judge Lynch's reasoning in Shady Records that a bright line rule—precluding an award of statutory damages and attorney's fees when any infringement occurs before the effective date of copyright registration—is "preferable" to requiring courts to consider, on a case-by-case basis, whether a series of infringements "has stopped sufficiently such that the restart constitutes a new set of infringements." U2, 2008 WL 3906889, at *15; Shady Records, 2005 WL 14920, at *22. Here, Defendant's re-posting of the same content through the same medium constitutes a continuing infringement, and Section 412 precludes the recovery of statutory damages and attorney's fees.

## CONCLUSION

The Court therefore adopts Judge Ellis's R & R in its entirety. Plaintiff is entitled to the following declarations:

(1) Plaintiff is the sole author of the Film;

(2) Plaintiff is the sole copyright owner of the Film;

(3) Defendants infringed Plaintiff's copyright in the Film; and

(4) The two agreements between Mr. Bell and James Richard and Soopum Sohn procured by Mr. Bell purporting to transfer certain interests in the Film to Mr. Bell are null and void.

Additionally, the Court permanently enjoins Defendants from using any aspect of the Film in any way and orders them to remove all existing infringing works and to take reasonable efforts to regain copies of the infringing works that they distributed to third parties.

Plaintiff's requests for actual damages, an award of Defendants' profits, statutory damages, and attorney's fees are denied.

Plaintiff shall submit a proposed judgment consistent with this Opinion and Order by April 11, 2014, and shall serve a copy of this Opinion and Order on Defendants.

The Clerk of Court is respectfully requested to close the motion pending at docket number 36.

SO ORDERED.

Dated:     March 28, 2014
           New York, New York

                                                    _____
                                                    Ronnie Abrams
                                                    United States District Judge